# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 7, 2010        Decided April 17, 2012

No. 11-1117

UNITED STATES POSTAL SERVICE,
PETITIONER

v.

POSTAL REGULATORY COMMISSION,
RESPONDENT

AMERICAN CATALOG MAILERS ASSOCIATION, ET AL.,
INTERVENORS

———

On Petition for Review of an Order
of the Postal Regulatory Commission

———

*Michael J. Elston*, Chief Counsel, U.S. Postal Service, argued the cause and filed the briefs for petitioner.

*William D. Blakely*, *Lauren P. DeSantis-Then*, and *William E. Quirk* were on the briefs for intervenor American Catalog Mailers Association in support of petitioner.

*Abby C. Wright*, Attorney, U.S. Department of Justice, argued the cause for respondent. With her on the brief were

*Tony West*, Assistant Attorney General, *Michael S. Raab*, Attorney, *Stephen L. Sharfman*, General Counsel, Postal Regulatory Commission, *R. Brian Corcoran*, Deputy General Counsel, and *Katrina R. Martinez*, Attorney.

*William J. Olson*, *John S. Miles*, *Herbert W. Titus*, and *Thomas W. McLaughlin* were on the brief for intervenors L.L. Bean, Inc., et al. in support of respondent.

Before: GARLAND and GRIFFITH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*:  As amended by the 2006 Postal Accountability and Enhancement Act ("PAEA"), title 39 of the U.S. Code requires the United States Postal Service to submit to the Postal Regulatory Commission, within 90 days of the end of each fiscal year, a financial report that "analyze[s] costs, revenues, rates, and quality of service . . . in sufficient detail to demonstrate that all products during [that] year complied with all applicable requirements of this title."  39 U.S.C. § 3652(a).  After a period for public comment, the Commission must issue an order determining "whether any rates . . . in effect during [that] year (for products individually or collectively) were not in compliance with applicable provisions of this chapter," and may direct the Postal Service to remedy any violations.  See *id*. § 3653(b)(1).

Fulfilling these duties, the Commission issued its 2010 Annual Compliance Determination ("ACD"), finding in part that the rates for a particular product—Standard Mail Flats, a subset of Standard Mail—were in violation of 39 U.S.C. § 101(d)'s mandate that "[p]ostal rates shall be established to apportion the costs of all postal operations to all users of the

mail on a fair and equitable basis."  See Annual Compliance Determination Report for Fiscal Year 2010, *available at* http://www.prc.gov/Docs/72/72382/PRC_ACD_2010.pdf,  at 106.    Because the revenues from Standard Flats fell significantly short of the product's costs, a deficit that had only increased in recent years, the Commission determined that current rates "reflect[ed] an unfair and inequitable apportionment of the costs of postal operations of all Standard Mail users," contrary to the demands of § 101(d).  *Id.*  In the Commission's view, the persistent losses incurred by Standard Flats amounted to a subsidy of Flats at the expense of other Standard Mail products (and their customers), whose rates it saw as being artificially inflated in order to make up the difference.  In order to remedy the violation, the Commission ordered the Postal Service to "increase the cost coverage" for Standard Flats "until such time that the revenues for this product exceed attributable costs."  *Id.*

The Postal Service seeks review of this determination, arguing that the PAEA does not permit reliance on 39 U.S.C. § 101(d) for purposes of the ACD, and that the determination regarding Standard Flats was otherwise arbitrary and capricious.  We think that the Commission acted within its statutory authority but remand for an explanation of the relation between its remedy, on one hand, and its treatment of other products and indeed the bounds of its authority, on the other.

\* \* \*

Some statutory mandates apply generally to all of the Postal Service's products, see, e.g., 39 U.S.C. § 101, whereas many differ depending on whether the product is market-dominant (as is true of Standard Mail products) or belongs to a second category—"competitive products," which consists of products also offered by other carriers, such as UPS.

4

Compare *id*. §§ 3621-29 (governing market-dominant products), with *id*. §§ 3631-34 (governing competitive ones). In particular, the PAEA provides the Commission with fourteen factors to consider when reviewing Postal Service rates for market-dominant products, see *id*. § 3622(c), and a separate list for competitive products, see *id*. § 3633(a).

Two of § 3622(c)'s fourteen factors governing market-dominant products are of particular relevance here: (1) subsection (c)(2)'s requirement "that each *class* of mail . . . bear the direct and indirect postal costs attributable to each class" (emphasis added) and (2) subsection (c)(14)'s general stipulation that the Commission consider "the policies of [title 39] as well as such other factors as the Commission determines appropriate."

The Postal Service's primary argument is that the Commission's decision on Standard Flats looked beyond the specific criteria Congress laid out for market-dominant products in § 3622(c). In particular, the Service focuses our attention on subsection (c)(2)'s use of the word "class," rather than "product." The Service contrasts subsection (c)(2) with the rules governing competitive products, which tell the Commission to "ensure that each competitive *product* covers its costs." 39 U.S.C. § 3633(a)(2) (emphasis added). It draws from this contrast the inference that within the market-dominant domain the Commission's power to require full cost coverage applies only to classes, not to the individual products within a class. Petitioner's Br. 21. (The logic of the distinction might be that non-cost-based pricing for a competitive product inflicts special damage—on competition and its expected consumer benefits. Of course that hypothesis doesn't explain how the Service, in marketing a class of products all of which are competitive, could generate returns sufficiently above cost to cross-subsidize other products within the class.) Clearly the linguistic distinction tends to

shore up the negative inference the Postal Service draws from § 3622(c)(2)'s omission of the word "product."

The Commission does not altogether dispute that negative inference, but argues in its brief that in an "extreme case" subsection (c)(14)'s catch-all phrase—invoking "the policies of this title as well as such other factors as the Commission determines appropriate"—allows it to incorporate the more generally applicable standards found in 39 U.S.C. § 101. Respondent's Br. 29. The "title" referred to is title 39, which of course includes 39 U.S.C. § 101(d). It thus interprets subsection (c)(14) to permit it to override the more particular requirements found in subsection (c)'s thirteen specific factors, where necessary to "apportion the costs of all postal operations to all users of the mail on a fair and equitable basis," see *id*. § 101(d), and more generally to make sure that market-dominant rates are "consistent with the overarching financial and policy goals set forth" in the PAEA. Respondent's Br. 31 (quoting S. Rep. No. 108-318, at 8 (2004)). The Commission also invokes another broad clause: Congress specifically ordered the Service to provide data, in its annual reports, "in sufficient detail to demonstrate that all products during such year complied with *all applicable requirements of this title*." 39 U.S.C. § 3652(a)(1) (emphasis added). This mandate clearly goes beyond chapter 36 (dealing in specificity with postal rates, classes and services), and reaches chapter 1, which contains § 101(d).

This conflict between the negative implication of the PAEA's seemingly divergent treatment of market-dominant and competitive products, and the all-purpose language of §§ 3622(c)(14) and 3652(a)(1), seems a close call. But another provision helps tilt the scale to the Commission. The PAEA allows interested individuals to file complaints with the Commission asserting that Postal Service Rates are in violation of the statute. 39 U.S.C. § 3662 provides that "[a]ny

interested person (including an officer of the Postal Regulatory Commission representing the interests of the general public) who believes the Postal Service is not operating in conformance with the requirements of the provisions of sections 101(d) . . . , or this chapter . . . may lodge a complaint with the Postal Regulatory Commission." It would hardly make sense that "any interested person" could invoke the general standards of § 101(d) in a complaint filed with the Commission if the Commission itself could not consider such standards in its annual compliance determinations. At oral argument the Service could offer us no explanation for such an anomaly.

Given the ambiguous relationship between the special criteria governing the different classes of mail and the various other provisions of the statute, and finding the Commission's interpretation a reasonable one, see *U.S. Postal Service v. Postal Regulatory Comm'n*, 599 F.3d 705, 710 (D.C. Cir. 2010), we uphold its view.

* * *

Our finding that § 3622(c) permits the Commission to invoke § 101(d) vis-à-vis market-dominant products, at least in extreme circumstances, does not end the case. The Postal Service also contends that the remedy imposed by the Commission was arbitrary and capricious. In its order, the Commission directed "the Postal Service to increase the cost coverage of the Standard Mail Flats product . . . until such time that the revenues for this product *exceed* attributable costs." ACD at 106 (emphasis added). In other words, the Commission's order implied that only 100% cost coverage, and nothing short of 100%, would bring Standard Flats into compliance with § 101(d). This appears quite inconsistent with the Commission's treatment of other market-dominant products, several of which have comparable, or even lower,

cost coverage than Standard Flats.  While Standard Flats' cost coverage is 82%, that of Standard Mail Not Flat-Machinable Pieces ("NFMs") and Parcels is only 78%.  ACD at 101; see also *id.* at 90-94 (discussing Periodicals' cost coverage, 75.46%, though there the pricing is subject to special statutory limitations).  Yet for these products, unlike Standard Flats, the Commission has not explicitly mandated complete cost coverage.  See *id.* at 101 (noting only that the Service is making "significant efforts to address [the] problem" of Standard Mail NFMs/Parcels).  Further, to the extent that the Commission's authority to force increases in market-dominant product rates on the basis of § 101(d) is limited to "extreme" cases of deficiency in cost coverage, a point on which the Commission hangs its argument here, the Commission's explanatory gap is palpable.  Why might not Standard Flats cease to be an extreme case at some slightly-less-than-complete cost coverage number (Would 95% suffice? What about 99%?).

We therefore grant the petition for review and remand to the Commission for a definition of the circumstances that trigger § 101(d)'s failsafe protection, and for an explanation of why the particular remedy imposed here is appropriate to ameliorate that extremity.  See *Public Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) (requiring agencies to "adequately explain [their] result[s]").  We have also considered the other contentions of the petitioner and intervenors and reject them.

*So ordered.*