# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued May 10, 2019       Decided September 13, 2019

No. 18-1328

DOUGLAS F. CARLSON,
PETITIONER

v.

POSTAL REGULATORY COMMISSION,
RESPONDENT

PITNEY BOWES INC. AND UNITED STATES POSTAL SERVICE,
INTERVENORS

On Petition for Review of an Order
of the Postal Regulatory Commission

*Douglas F. Carlson*, Pro se, argued the cause and filed the briefs for petitioner.

*Joshua M. Salzman*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were *Michael S. Raab*, Attorney, *David A. Trissell*, General Counsel, Postal Regulatory Commission, *Anne J. Siarnacki*, Deputy General Counsel, and *Laura E. Zuber*, Attorney.

Before: MILLETT, KATSAS, and RAO, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* RAO.

RAO, *Circuit Judge*: Wedding invitations, birthday cards from grandma, and electricity bills all travel through the United States Postal Service with a simple first-class stamp. Perhaps unnoticed by many who use the "Forever Stamp," in January 2019, the Postal Service raised the price of this stamp by five cents, a ten-percent increase. Douglas Carlson's *pro se* petition challenges this stamp price hike, which is part of Postal Regulatory Commission Order 4875,[1] as inconsistent with the Administrative Procedure Act (APA).

We agree with Carlson that the stamp price hike did not meet the APA's requirements for reasoned decisionmaking. The Commission failed to provide an adequate explanation of the increase and, relatedly, failed to respond to public comments challenging the increase under relevant statutory factors and objectives included in the Commission's organic statute, the Postal Accountability and Enhancement Act (PAEA). Accordingly, we grant the petition for review and vacate the part of Order 4875 addressing rate adjustments for the category of first-class mail. Because the category of first-class rates is severable, we leave the remainder of the Order intact.

I.

We begin with the statutory requirements governing the Commission. In enacting the PAEA, Congress moved from an adjudicatory model of postal rate review to a regulatory one. "[A]dministrative procedures are divided into two categories," adjudication and rulemaking, with the latter defined as "prospective decisions of general applicability focusing on

---

[1] Postal Regulatory Comm'n, Order No. 4875, Dkt. R2019-1 (Nov. 13, 2018), J.A. 186.

policy." 2 Charles H. Koch, Jr. & Richard Murphy, *Administrative Law & Practice* § 5:1 (3d ed. 2019). Regulation "is primarily concerned with policy considerations" while "adjudication is concerned with the determination of past and present rights and liabilities." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 219 (1988) (Scalia, J., concurring) (quoting Attorney General's Manual on the Administrative Procedure Act 14 (1947) ("AG Manual")).

Before the PAEA, adjudication of postage rates was a lengthy process that delayed rate changes by as much as eighteen months. S. Rep. No. 108-318, at 3–4 (2004). The PAEA reconstituted the Postal Rate Commission as the Postal Regulatory Commission, an agency headed by five commissioners appointed by the President and removable only for stated causes.[2] *See* 39 U.S.C. §§ 501–02. The PAEA strengthened the role of the Commission by repealing the Postal Service's authority to modify rates without the

---

[2] From 1789 to 1970, the Post Office Department administered the Nation's mails. *See* Act of Sept. 22, 1789, ch. 16, 1 Stat. 70. Between 1970 and the enactment of the PAEA in 2006, Congress abolished the Post Office Department and divided ratemaking authority between the Postal Service and the Postal Rate Commission, two distinct agencies. *See* Postal Reorganization Act of 1970, 84 Stat. 719; *see also Nat'l Ass'n of Greeting Card Publishers v. U.S. Postal Serv.*, 462 U.S. 810, 813, 821 (1983). Under the prior Act, the Postal Service initiated rate changes by submitting requests to the Postal Rate Commission with "such suggestions for rate adjustments as it deem[ed] suitable." 39 U.S.C. § 3622(a) (2000). The Postal Rate Commission then conducted a hearing on the record and determined what rate to recommend to the Postal Service, taking into account nine statutory factors. *Id.* §§ 3622(b), 3624(a). The Postal Service had authority to challenge the Commission's rate recommendation and, in some circumstances, to reject the Commission's recommendation and impose its own modifications. *Id.* § 3625.

Commission's approval. *See* PAEA, Pub. L. No. 109-435, § 201(b), 120 Stat. 3198, 3205 (2006) (repealing 39 U.S.C. § 3625). The PAEA also abolished the requirement for the Commission to hold a hearing on the record prior to adopting any rate change. *Id.* (repealing 39 U.S.C. § 3624). Instead, Congress directed the Commission to establish "a modern system for regulating rates and classes for market-dominant products." 39 U.S.C. § 3622(a).

Rather than adjudicate rates through fact-intensive hearings, the PAEA requires the Commission to establish a regulatory system for rate approval and then evaluate and approve specific postal rates through rulemaking, subject to review under the standards of the APA. *Id.* §§ 3622, 3663. Because "[t]he APA does not contemplate the use of adjudication to develop rules," *Ala. Power Co. v. FERC*, 160 F.3d 7, 11 n.5 (D.C. Cir. 1998), Congress's decision to replace the Commission's adjudicatory model with a regulatory model guided by APA standards is significant. *See Bowen*, 488 U.S. at 218 ("The entire [APA] is based upon a dichotomy between rule making and adjudication." (quoting AG Manual)).

The PAEA dictates that the Commission's regulatory system "shall be designed" to achieve nine statutory objectives and "shall take into account" fourteen statutory factors. 39 U.S.C. § 3622(b)–(c) (reproduced in Appendix, *infra*). The Commission established the required "modern system for regulating rates" in November 2007. *See generally* Postal Regulatory Comm'n, Order No. 43, 72 Fed. Reg. 63,662 (Nov. 9, 2007) (the "system regulation"). The part of the system regulation relevant to this case addresses rate adjustments of general applicability. *See* 39 C.F.R. pt. 3010, subpart B. Under the system regulation, the Postal Service initiates a proposed rate change by providing notice to the public and to the Commission. *Id.* § 3010.10(a). Such notice must be provided

at least forty-five days prior to a rate change, and the Postal Service is encouraged to provide as much advance notice as practicable. *Id.* § 3010.10. The Postal Service's notice must include, among other things, "[a] discussion that demonstrates how the planned rate adjustments are designed to help achieve the objectives listed in 39 U.S.C. § 3622(b) and properly take into account the factors listed in 39 U.S.C. § 3622(c)." *Id.* § 3010.12(b). The notice must also include any "other information" that would assist the Commission in issuing "a timely determination of whether the planned rate adjustments are consistent with applicable statutory policies." *Id.* § 3010.12(b)(12). The Postal Service's notice serves as the proposed rule before the Commission issues a final regulation, i.e., the rate approval order.

After receiving notice from the Postal Service, the Commission establishes a docket allowing twenty days for public comment on the proposed change. *Id.* § 3010.11(a). Within fourteen days of the end of the comment period, the Commission must "issue an order announcing its findings." *Id.* § 3010.11(d). The system regulation does not specify how the Commission must consider the PAEA's objectives and factors; however, rate adjustments must be "consistent with applicable law." *Id.* § 3010.11(e), (i). If the Commission finds that a proposed rate adjustment is inconsistent with applicable law, the Postal Service must amend its notice, include "sufficient explanatory information to show that all deficiencies identified by the Commission have been corrected," and allow an additional seven-day period of public comment. *Id.* § 3010.11(f), (g).

The Postal Service proposed the stamp price hike in October 2018 as part of a series of adjustments to the category

of first-class postage rates.[3] *See* U.S. Postal Serv., Notice of Market-Dominant Price Change, Dkt. No. R2019-1 (Oct. 10, 2018), J.A. 1. Under the proposal, the rate for a one-ounce, stamped letter would increase from fifty cents to fifty-five cents. This ten percent increase required the Service to adjust other classes of first-class postage rates in order to stay within the overall statutory price increase cap of about 2.5 percent. *See* 39 U.S.C. § 3622(d)(1)(A). The proposal thus decreased the price of some first-class mail products and increased others by a smaller percentage. The stamp price hike, however, was remarkable—the largest absolute increase in the price of stamps since 1863.[4] As a percentage, it was the largest increase since 1995.[5]

The Postal Service justified the magnitude of the stamp price hike by asserting an interest in keeping the price of stamps "at round numbers divisible by five." J.A. 8. According to the Postal Service, this approach helps to achieve "simplicity of structure"—one of the fourteen factors under the PAEA, *see* 39 U.S.C. § 3622(c)(6)—by "facilitat[ing] convenience for retail customers" through "a straightforward, understandable pricing structure." J.A. 8–9. The Postal Service sought to minimize concern about the size of the stamp price hike by asserting that corresponding reductions in postage rates for first-class mail products with nonstandard weight or shape would mitigate the impact of the increased price of first-class letter stamps. Moreover, the Service stated its intent to keep stamp prices divisible by five in future years, suggesting that a large increase

---

[3] The first-class postage adjustments were part of a notice to adjust rates across several other categories of market-dominant products. Those other rates are not challenged here.

[4] *See* U.S. Postal Serv., *Rates for Domestic Letters Since 1863* (Feb. 2019), https://about.usps.com/who-we-are/postal-history/domestic-letter-rates-since-1863.pdf (listing rates).

[5] *See id.*

in the price of stamps in 2019 might postpone the need for another increase, "subject to the business conditions that obtain in coming years." J.A. 9.

The Commission opened a docket to receive public comment for the required twenty days. *See* Postal Regulatory Comm'n, Order No. 4851, 83 Fed. Reg. 52,242 (Oct. 16, 2018). During this time, the Commission received thirty-four comments, including a comment from Carlson, a postal customer and watchdog. *See Carlson v. U.S. Postal Serv.*, 504 F.3d 1123 (9th Cir. 2007).

Carlson raised a series of arguments against the stamp price hike, including that the Service failed to account for several statutory objectives and factors. First, Carlson argued that keeping the price of a stamp divisible by five did not promote the value of "simplicity of structure" under 39 U.S.C. § 3622(c)(6). J.A. 95–100. Second, he disputed the Postal Service's evaluation of the stamp price hike's likely impact and argued that the detrimental "effect of rate increases upon the general public" weighed against the Postal Service's proposal under 39 U.S.C. § 3622(c)(3). J.A. 103–05. Third, he argued that raising the price of stamps by five cents was inconsistent with the statutory objective of "establish[ing] and maintain[ing] a just and reasonable schedule for rates" under 39 U.S.C. § 3622(b)(8). J.A. 104. The Greeting Card Association similarly commented on flaws in the Postal Service's simplicity-of-structure rationale and noted the need to consider other statutory factors. J.A. 111–16. The Association for Postal Commerce argued that increasing the price of stamps in five-cent increments could reduce "predictability and stability in rates," contrary to the statutory objective under 39 U.S.C. § 3622(b)(2). J.A. 89.

After the close of the public comment period, the Commission issued Order 4875. The Order included a finding that the overall first-class mail rate adjustments, including the stamp price hike, were "consistent with 39 U.S.C. §§ 3622(d) and 3622(e), and may take effect as planned." J.A. 250. The Order referenced, but did not resolve, Carlson's disagreement with the Postal Service's simplicity-of-structure rationale. Instead, the Order encouraged the Postal Service "to collaborate with mailers . . . about pricing" in order to reassess the utility of keeping stamp prices divisible by five in the future. J.A. 209. Aside from "simplicity of structure," the Commission did not cite any of the PAEA objectives and factors listed in subsections 3622(b) and (c), but instead evaluated the increase only for compliance with quantitative rate caps established by other provisions of the PAEA. The Commission determined that the Postal Service's proposal complied with the rate cap and approved the rate increase, stating that "subject to certain limitations, most prominently the price cap, the PAEA gives the Postal Service pricing flexibility within First-Class Mail." J.A. 208–09.

Carlson timely petitioned this Court for review of the first-class rate adjustments in Order 4875, arguing that the stamp price hike violated the APA because the Commission failed to consider relevant statutory objectives and factors and failed to provide a reasoned explanation of the exercise of its authority under the system regulation. The PAEA grants this Court jurisdiction over orders or decisions of the Commission and incorporates the APA as the framework for review. 39 U.S.C. § 3663; *see also GameFly, Inc. v. Postal Regulatory Comm'n*, 704 F.3d 145, 148 (D.C. Cir. 2013). Because Carlson is proceeding *pro se*, we construe his filings liberally. *See, e.g.*, *United States v. Gooch*, 842 F.3d 1274, 1278 (D.C. Cir. 2016).

9

II.

Carlson claims that the stamp price hike is arbitrary and capricious under the APA because the Commission failed to consider the objectives and factors listed in the PAEA. The Commission agrees that these statutory factors and objectives are relevant to rate review, but maintains that it has discretion to defer consideration of those provisions until after approving a rate change, especially given its interpretation that the PAEA requires the Commission to evaluate rate-change proposals quickly.

We conclude that the Commission's consideration of this increase fell short of the APA's requirements for reasoned decisionmaking because the Commission failed to provide an adequate explanation for the stamp price hike, and, relatedly, failed to respond to public comments challenging the stamp price hike under the PAEA's statutory factors and objectives. Moreover, the PAEA does not require the Commission to rush to decision. Based on the text and structure of the PAEA, we conclude that the PAEA requires consideration of all relevant statutory objectives and factors as part of the regulatory process and does not authorize the Commission to defer evaluation of those objectives and factors until after it approves a rate change. Finally, the system regulation requires the Commission to determine that proposed rate adjustments are "consistent with applicable law," 39 C.F.R. § 3010.11(e), before issuing a rate approval order. At a minimum, this also required the Commission to comply with the APA and the PAEA by weighing the statutory factors and objectives before adopting the stamp price hike.

A.

The stamp price hike is part of Order 4875, which is a "rule" within the meaning of the APA because it is an

"approval . . . for the future of rates." *See* 5 U.S.C. § 551(4); *see also* Order No. 43, 72 Fed. Reg. at 63,666 ("The notice and comment guarantees of section 553 of the APA apply to . . . rate adjustments."). When reviewing a rule under the APA, we will set aside an order that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). "The APA's arbitrary-and-capricious standard requires that agency rules be reasonable and reasonably explained." *Nat'l Tel. Coop. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009). An agency violates this standard if it "entirely fail[s] to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency also violates this standard if it fails to respond to "significant points" and consider "all relevant factors" raised by the public comments. *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35–36 (D.C. Cir. 1977).

Accordingly, an agency must respond to comments "that can be thought to challenge a fundamental premise" underlying the proposed agency decision. *MCI WorldCom, Inc. v. FCC*, 209 F.3d 760, 765 (D.C. Cir. 2000). An agency need not "discuss every item of fact or opinion included in the submissions made to it." *Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 17 (D.C. Cir. 2015) (citation omitted). An agency's response to public comments, however, must be sufficient to enable the courts "to see what major issues of policy were ventilated . . . and why the agency reacted to them as it did." *Id.* (citation omitted). Even when an agency "has significant discretion in deciding how much weight to accord each statutory factor," that does not mean it is "free to ignore any individual factor entirely." *Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 934 (5th Cir. 1998) (citing *Weyerhaeuser Co. v. Costle*, 590 F.2d 1011, 1045 (D.C. Cir. 1978))

(evaluating agency's consideration of statutory factors under arbitrary-and-capricious review).

The PAEA sets forth a framework of statutory objectives and factors for consideration in rate setting. While the statute does not specify how these objectives and factors must be accounted for in any particular rate order, the Commission must apply the relevant objectives and factors to individual rate adjustments. Our cases confirm this and provide some limited guidance. We have held that "[i]n reviewing [proposed] rates for market-dominant products, the Commission must consider the statutory factors set out in 39 U.S.C. § 3622(c)." *Newspaper Ass'n of Am. v. Postal Regulatory Comm'n*, 734 F.3d 1208, 1210 (D.C. Cir. 2013). The factors listed in the PAEA "establish[] rate requirements for all market-dominant products." *Id.*; *see also U.S. Postal Serv. v. Postal Regulatory Comm'n*, 676 F.3d 1105, 1107 (D.C. Cir. 2012) (for purposes of the Commission's annual compliance determination, "the PAEA provides the Commission with fourteen factors to consider when reviewing Postal Service rates" in effect during the preceding year).

Congress left the Commission leeway to establish, through regulation, a process for considering the PAEA's objectives and factors. 39 U.S.C. § 3622(a)–(c). We recognize that not every statutory factor and objective will be relevant to an individual rate assessment and that the weight accorded particular factors may therefore vary in each case. But this does not mean the Commission may simply disregard the objectives and factors when approving rate adjustments. Pursuant to the APA, the Commission's orders must be "reasonable and reasonably explained." *Nat'l Tel. Coop. Ass'n*, 563 F.3d at 540.

Indeed, the Commission has long recognized that the PAEA's objectives and factors are relevant to the assessment

of postage rates. *See* Order No. 43, 72 Fed. Reg. at 63,665 (explaining that the system regulation requires the Postal Service to address statutory objectives and factors as part of "a broad range of relevant issues in any notice of rate adjustment"); Postal Regulatory Comm'n, Order No. 203, 74 Fed. Reg. 20,834, 20,841 (May 5, 2009) (stating that Order 43 implemented "a system of ratemaking to foster achievement of the requirements, objectives, and factors spelled out in" 39 U.S.C. § 3622(b)–(c)). Similarly, in this case, the Commission acknowledges that lack of compliance with the objectives and factors can justify disapproval of a rate-change proposal and that the objectives and factors are relevant in the annual compliance review and adjudication of complaints.

Moreover, consideration of the statutory factors is implicitly required by the Commission's system regulation. Under the system regulation, the Postal Service's initial notice to the Commission of a proposed rate change must include "[a] discussion that demonstrates how the planned rate adjustments are designed to help achieve the objectives listed in 39 U.S.C. § 3622(b) and properly take into account the factors listed in 39 U.S.C. § 3622(c)." 39 C.F.R. § 3010.12(b)(7). More generally, the Postal Service must provide all information the Service believes "will assist the Commission to issue a timely determination of whether the planned rate adjustments are consistent with applicable statutory policies." *Id*. § 3010.12(b)(12).

The Commission must then determine whether the Postal Service's planned rate adjustments are "consistent with applicable law," *id.* § 3010.11(e), before the adjustments may take effect. If the Commission finds the rate adjustments are "inconsistent with applicable law," the Postal Service must submit an amended notice explaining how it has modified the proposal to comply with relevant law. *Id*. § 3010.11(f). If an

amended notice is still "found to be inconsistent with applicable law, the Commission shall explain the basis of its determination and suggest an appropriate remedy." *Id.* § 3010.11(j).

The system regulation therefore makes clear that the Commission must exercise its rulemaking authority consistent with applicable law, which at a minimum includes the requirements of the PAEA and the APA. After receiving the Postal Service's notice, the Commission must independently determine whether a proposed rate adjustment is "consistent with applicable law." A proper application of the system regulation thus requires the Commission to consider the statutory objectives and factors before issuing a rate adjustment order.

## B.

The public comments about the stamp price hike highlighted several relevant statutory objectives and factors the Commission was required to consider under the APA. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *Home Box Office*, 567 F.2d at 35–36. Of course, the Commission should consider all relevant statutory factors when reviewing the Service's rate adjustment notice, not only those factors raised in the public comments. The Commission, however, must also respond to significant points raised by the comments, especially when those comments challenge a fundamental premise underlying a rate increase. *See MCI WorldCom*, 209 F.3d at 765. When evaluating the Postal Service's proposed stamp price hike, the Commission failed to address three categories of public comments that warranted response.

First, the Commission failed to address public comments that undermined the Postal Service's interpretation of "simplicity of structure," a PAEA factor. In its notice, the

Postal Service claimed that keeping stamp prices divisible by five promotes "simplicity of structure" by "facilitat[ing] convenience" and making prices "straightforward" and "understandable." J.A. 8–9. In response, the Greeting Card Association argued that no individual rate change could achieve "simplicity of structure" "for the entire schedule." J.A. 114. In his public comment, Carlson similarly argued that no individual postage rate constitutes a "structure." J.A. 100–02. These comments refer to the text of the PAEA, which requires a particular type of simplicity: "simplicity of structure for the entire schedule and simple, identifiable relationships between the rates or fees charged the various classes of mail for postal services." 39 U.S.C. § 3622(c)(6). By its plain terms, the statute refers to the simplicity of the pricing schedule as a whole and the relationships between different rates charged for different classes of postal services. It is not a provision about simple consumer prices, as suggested by the Postal Service.

Carlson also challenged the Postal Service's claim of convenience, noting that most transactions would not involve the supposed inconvenience of counting pennies because most customers pay by debit or credit card and buy stamps in multiples of five.[6] He suggested that customers who buy one stamp at a time and pay in cash are more likely to have low incomes and "may not appreciate the supposed 'convenience' of a higher price." J.A. 100. The Greeting Card Association added that retail customers are accustomed to stamp prices that frequently are not divisible by five. J.A. 112. Disputing the Postal Service's claims, Carlson also argued that the meaning of fifty-two cents is just as clear and straightforward as the meaning of fifty-five cents and noted that the public had never struggled to understand the price of stamps, even though that price had not been divisible by five for most of the nation's

---

[6] Stamp booklets contain 20 stamps and stamp coils contain 100.

history. J.A. 97–98. These public comments called into question the justifications offered by the Postal Service, and therefore the Commission should have evaluated whether divisibility by five did, in fact, promote the statutory interest in "simplicity of structure." *See MCI WorldCom*, 209 F.3d at 765.

Second, the Commission did not address public comments arguing that the proffered justification for the stamp price hike misstated the "effect of rate increases upon the general public." *See* 39 U.S.C § 3622(c)(3). The Postal Service claimed that reduced surcharges for nonstandard first-class mail products would mitigate the stamp price hike's impact and suggested that in the future the Service would continue to raise rates in five-cent increments so that rates would need to be raised less frequently. J.A. 8–9. In his public comment, Carlson argued that rate reductions for nonstandard mail products could not meaningfully mitigate the effect of the stamp price hike because the reductions applied to only about three percent of first-class mail. Carlson also noted that the Postal Service had not committed to less frequent rate increases and that the five-cent increment simply meant higher prices. J.A. 103–05. The Commission's analysis acknowledged that the Postal Service had not committed to less frequent rate increases and, in fact, expressly noted the Postal Service's "flexibility" to depart from five-cent increases in future price adjustments. J.A. 208–09. The Commission did not address Carlson's other concerns about the stamp price hike's effect on the general public, did not acknowledge that the public effect of the increase was a statutory factor, and did not explain how this factor fit into the Commission's overall assessment of the stamp price hike's compliance with the PAEA.

Third, the Commission failed to address public comments raising three additional statutory objectives and factors that weighed against a five-cent increase in the price of stamps. For

example, the Greeting Card Association provided comments concerning "the available alternative means of sending and receiving letters and other mail matter at reasonable costs," 39 U.S.C. § 3622(c)(4). It argued the Commission should consider the risk that the stamp price hike would hasten the trend toward electronic bill payment systems. J.A. 115. The Association for Postal Commerce argued that increasing stamp prices by large amounts at infrequent intervals would undermine the statutory objective of "predictability and stability in rates," 39 U.S.C. § 3622(b)(2). J.A. 89. Carlson argued that an unprecedented stamp price hike based solely on a frivolous appeal to the convenience of nickels over pennies was inconsistent with the statutory objective of maintaining "a just and reasonable schedule for rates," 39 U.S.C. § 3622(b)(8). J.A. 104. These comments merited a response because they challenged the Commission's primary rationale by raising substantial countervailing statutory considerations. *See MCI WorldCom*, 209 F.3d at 765. Yet the Commission did not evaluate any of these statutory objectives and factors or explain how they should be weighed against the "simplicity of structure" rationale to determine whether the stamp price hike was consistent with the framework of the PAEA.

In his appeal, Carlson largely repeats the arguments made in comments before the Commission. In response, the Commission maintains it satisfied any obligation to consider the statutory objectives and factors in its rate-approval order by focusing on pricing flexibility, which is both an objective and a factor under the PAEA. *See* 39 U.S.C. § 3622(b)(4), (c)(7). Order 4875 noted that "subject to certain limitations, most prominently the price cap, the PAEA gives the Postal Service pricing flexibility within First-Class Mail." Order No. 4875 at 19–20. According to the Commission, the Order's reference to the Postal Service's pricing flexibility constitutes a sufficient evaluation of the statutory objectives and factors.

We conclude that the Commission fell short of the APA's requirement for reasoned decisionmaking because it did not adequately analyze the stamp price hike's compliance with all of the PAEA's relevant statutory objectives and factors, particularly those raised in the public comments.[7] *See Newspaper Ass'n*, 734 F.3d at 1210; *Home Box Office*, 567 F.2d at 35–36. The Commission did not address whether the Postal Service's claims about the convenience, straightforwardness, and understandability of prices divisible by five had anything to do with the PAEA's requirement for "simplicity of structure," and offered no explanation for why it could not undertake such an analysis in the time provided for its review. The Commission also failed to evaluate how other statutory objectives and factors might bear on the proposed rate change or outweigh the Postal Service's reliance on "simplicity of structure." Thus, the Commission failed to "demonstrate the rationality of its decision-making process by responding to those comments that are relevant and significant." *Grand Canyon Air Tour Coal. v. FAA*, 154 F.3d 455, 468 (D.C. Cir. 1998); *see also MCI WorldCom*, 209 F.3d at 765 (an agency must respond to comments "that can be thought to challenge a fundamental premise"). Because the Commission cannot

---

[7] We decline to adopt the Commission's purported "blatant disregard" standard as the test for when the Commission must address statutory factors and objectives during a rulemaking on rates. This standard arises from the Commission's post-hoc characterization of its regulations in an order setting forth the Commission's approach to workshare discounts under 39 U.S.C. § 3622(e). *See* Postal Regulatory Comm'n, Order No. 536 at 34 (Sept. 14, 2010), *available at* https://www.prc.gov/Docs/70/70204/Order_No_536.pdf. It is not established by law, is not codified in any regulation, has no direct application to rates other than workshare discounts, lacks definition (as the Commission conceded during oral argument), and conflicts with the APA requirements described above.

determine whether a rate adjustment is "consistent with applicable law" without weighing the PAEA's enumerated factors and objectives, the Commission also failed to comply with the system regulation in adopting the stamp price hike.

C.

We find unpersuasive the Commission's arguments that its limited review of the stamp price hike was justified because the PAEA requires a quick decisionmaking process that does not allow sufficient time to evaluate the statutory objectives and factors. The Commission asserts that the stamp price hike satisfies the PAEA's price cap and other quantitative factors, and therefore is valid even without a fuller consideration of the PAEA's "qualitative" objectives and factors. In effect, the Commission argues that the demands of the PAEA modify the ordinary requirements of the APA that a decision be "reasonable and reasonably explained." *Nat'l Tel. Coop. Ass'n*, 563 F.3d at 540.

Yet absent a clear statement, this court will not assume that a statute modifies the reasoned decisionmaking requirements of the APA. *See* 5 U.S.C. § 559 ("[A] [s]ubsequent statute may not be held to supersede or modify . . . [the APA] . . . except to the extent that it does so expressly."); *City of New York v. Permanent Mission of India to United Nations*, 618 F.3d 172, 203 (2d Cir. 2010) ("Subsequent organic statutes may supersede or modify APA requirements, but they must do so expressly."); *see also Dickinson v. Zurko*, 527 U.S. 150, 155 (1999). This comports with "this Court's duty to interpret Congress's statutes as a harmonious whole rather than at war with one another." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1619 (2018). Moreover, the PAEA specifically incorporates the APA standards of review for Commission actions and

nothing in the text or structure of the PAEA suggests the Commission can shortchange the requirements of the APA.

Since the enactment of the PAEA and in its system regulation, the Commission has maintained that Congress intended the Commission's review of proposed rate changes to be simple enough to complete in forty-five days. Order No. 43, 72 Fed. Reg. at 63,665. It claims that this timeline comes from the PAEA, which provides:

> The system for regulating rates and classes for market-dominant products shall . . . not later than 45 days before the implementation of any adjustment in rates under this section, . . .—
>     (i)     require the Postal Service to provide public notice of the adjustment;
>     (ii)     provide an opportunity for review by the Postal Regulatory Commission;
>     (iii)     provide for the Postal Regulatory Commission to notify the Postal Service of any noncompliance of the adjustment with the limitation under subparagraph (A); and
>     (iv)     require the Postal Service to respond to the notice provided under clause (iii) and describe the actions to be taken to comply with the limitation under subparagraph (A).

39 U.S.C. § 3622(d)(1)(C). In its system regulation, the Commission interprets this provision to mean that "[t]he inference is strong that Congress contemplated that complicated or subjective compliance issues would be addressed during the annual compliance review, or through the complaint procedures of section 3662." Order No. 43, 72 Fed. Reg. at 63,665. The Commission candidly acknowledges that it prioritizes the speed of the rulemaking process over its

thoroughness and scope, based on the view that it could "give close scrutiny to only a limited number of compliance issues in the time available" under 39 U.S.C. § 3622(d)(1)(C). *Id.* The Commission has consistently maintained this interpretation in subsequent orders as well as in its litigating position here.

The Commission's interpretation, however, is contrary to the plain language of the statute when read as a whole. "[C]ourts must give effect to the clear meaning of statutes as written," *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 476 (1992), which includes "the broader context of the statute as a whole," *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). Even an agency's consistent and longstanding interpretation, if contrary to statute, can be overruled. "A regulation's age is no antidote to clear inconsistency with a statute." *Brown v. Gardner*, 513 U.S. 115, 122 (1994); *see also SEC v. Sloan*, 436 U.S. 103, 118 (1978) ("Nor does the existence of a prior administrative practice, even a well-explained one, relieve us of our responsibility to determine whether that practice is consistent with the agency's statutory authority."); *Se. Ala. Med. Ctr. v. Sebelius*, 572 F.3d 912, 920 (D.C. Cir. 2009) ("No matter how consistent its past practice, an agency must still explain why that practice comports with the governing statute and reasoned decisionmaking. . . . [N]o amount of historical consistency can transmute an unreasoned statutory interpretation into a reasoned one."); Antonin Scalia, *Judicial Deference to Administrative Interpretations of Law*, 1989 Duke L.J. 511, 517 (1989) ("[T]here is no longer any justification for giving special deference to long-standing and consistent agency interpretations of law.").

The Commission misreads the PAEA, which requires four actions to be completed "not later than 45 days before the implementation of any adjustment in rates under this section." 39 U.S.C. § 3622(d)(1)(C). One of the actions is "review by the

Postal Regulatory Commission." *Id.* § 3622(d)(1)(C)(ii). The PAEA is silent about the amount of time the Commission may take *during* its review. Congress did not limit the scope and duration of the Commission's review, but did charge the Commission with setting rates through rulemaking (rather than adjudication), with the due consideration required by the APA.

Moreover, other provisions within the PAEA provide relevant context, further reinforcing that Congress did not abbreviate the Commission's review period. "[I]n expounding a statute, we must not be guided by a single sentence . . . but look to the provisions of the whole law." *Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 895 F.3d 90, 97 (D.C. Cir. 2018) (quoting *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993)). The PAEA establishes a ninety-day timeline for "expedited" review of rate changes under "extraordinary or exceptional circumstances." 39 U.S.C. § 3622(d)(1)(E). Providing for an expedited review in exceptional circumstances that could take up to ninety days belies the Commission's claim that the PAEA requires an ordinary review to be completed in just half that time. Similarly, reading the PAEA alongside the APA suggests that if any inference should be drawn from the forty-five day delay period, it would be that Congress wanted the public to have more notice before a rate change. The APA requires a minimum of thirty days between the announcement of a final rule and its effective date. 5 U.S.C. § 553(d). The PAEA's forty-five day minimum is longer than the ordinary delay period and the statute is silent regarding the amount of time allocated for the Commission's consideration of a rate adjustment.

As the Commission admitted at oral argument, it is unable to locate a short review period within the PAEA's text or structure. Instead, the Commission leans heavily on legislative

history and defends its limited and expedited consideration during the rate approval process with citations to a Senate Report, as well as to a post-enactment letter signed by two senators and submitted as part of the public comments on the proposed system regulation. Yet when the statutory text is clear, legislative history should not be used to muddy its meaning. *See Ratzlaf v. United States*, 510 U.S. 135, 147–48 (1994). And, by definition, post-enactment statements of members of Congress are not even part of the legislative history. *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011) ("Post-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation."). The PAEA is silent about how long the Commission has to approve a proposed rate adjustment and legislative history cannot provide the express statement necessary to eliminate the reasoned decisionmaking required by the APA. *See* 5 U.S.C. § 559. Nothing in the PAEA justifies a truncated rulemaking analysis that fails to meet the requirements of the APA.

We also reject the Commission's argument that it can satisfy the PAEA by deferring consideration of the statutory factors and objectives until its annual compliance review or in the adjudication of individual complaints that a specific rate regulation is inconsistent with the PAEA. Standing alone, annual reviews and complaint adjudications do not satisfy the PAEA's requirement that the Commission create a "modern system for regulating rates" that is specific to market-dominant products and reflects the concerns enumerated in 39 U.S.C. § 3622(b)–(c). The annual reviews and complaint adjudications were established by Congress in separate sections of the PAEA that apply to postage rates generally and reflect no special consideration for concerns specific to market-dominant products. *See id.* §§ 3653(b), 3662(a). Complaints and annual reviews take place after rulemaking is complete. Such post-implementation review of rates shifts the burden of

proof to the public to demonstrate the unreasonableness of rates that have already been adopted, instead of requiring the Commission to demonstrate through reasoned rulemaking that its proposed rates comply with the APA and PAEA. *See, e.g.*, *Nat'l Lime Ass'n v. EPA*, 627 F.2d 416, 433 (D.C. Cir. 1980) ("[A]n initial burden of promulgating and explaining a non-arbitrary, non-capricious rule rests with the [a]gency.").

In addition, as a practical matter, an invalid rate increase can result in overpayment to the Postal Service without any means of recovery. *See* 39 U.S.C. § 3681 (prohibiting reimbursement for any amount paid pursuant to a rate later determined to be unlawful). Moreover, the complaints and annual reviews have separate dockets, and there is no mechanism for taking into consideration issues that were raised in the public comment period but were not addressed by the Commission during the initial rulemaking.

The statutory structure confirms the annual review and separate complaint process cannot provide a post-hoc rationalization of rate adjustments. "Just as Congress' choice of words is presumed to be deliberate, so too are its structural choices." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013). The annual review and complaint process exist apart from the regulatory system for market-dominant products and cannot satisfy the PAEA framework, the APA's requirements for reasoned decisionmaking, or the system regulation's requirement that the Commission determine whether a proposed rate adjustment is "consistent with applicable law" in the development and issuance of a rate approval order.

\* \* \*

Congress directed the Commission to serve as more than just a rubber stamp of the Postal Service's proposed rate

increases. The PAEA establishes a robust rulemaking process for the Commission, subjecting rate-change proposals to the deliberative and participatory process of notice-and-comment rulemaking under the APA. By failing to consider relevant statutory objectives and factors and declining to respond to significant public comments, the Commission violated the APA when it approved the stamp price hike.

## III.

We must next determine whether the stamp price hike can be severed from the other parts of Order 4875, which includes a rate adjustment for first-class mail products as well as adjustments for other mail categories. The APA requires a reviewing court to "hold unlawful and set aside agency action" that is arbitrary and capricious. 5 U.S.C. § 706(2). An "agency action" may be either "the whole or a part of an agency rule [or] order." 5 U.S.C. § 551(13) (incorporated by 5 U.S.C. § 701(b)(2)). Thus, the APA permits a court to sever a rule by setting aside only the offending parts of the rule. *See, e.g.*, *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988); *Virginia v. EPA*, 116 F.3d 499, 500–01 (D.C. Cir. 1997). Two conditions limit the exercise of this power. First, the court must find that "the agency would have adopted the same disposition regarding the unchallenged portion [of the regulation] if the challenged portion were subtracted." *Sierra Club v. FERC*, 867 F.3d 1357, 1366 (D.C. Cir. 2017). Second, the parts of the regulation that remain must be able to "function sensibly without the stricken provision." *Sorenson Commc'ns. Inc. v. FCC*, 755 F.3d 702, 710 (D.C. Cir. 2014) (quoting *MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001)).

Carlson requests that the court invalidate the five-cent stamp price hike. We determine that the category of first-class rate adjustments, including the stamp price hike, are a single

agency action that can be severed from the other parts of the Order. Although only the stamp price hike was at issue in this case, that increase cannot be separated from the rate adjustment for the category of first-class mail because the first-class provisions are "intertwined." *Epsilon Elecs., Inc. v. Dep't of Treasury, Office of Foreign Assets Control*, 857 F.3d 913, 929 (D.C. Cir. 2017). The PAEA links the prices of all first-class mail products, including stamps, by applying a rate cap to all first-class mail rather than to individual products within that category. *See* 39 U.S.C. § 3622(d)(2). The ten percent increase in the first-class letter stamp limited the Commission's ability to raise rates for other first-class mail products. In fact, the Order lowered rates for nonstandard first-class mail products and still fell barely within the rate cap. The Commission also approved the changes in rates for first-class mail as a package, treating them together in Ordering Paragraph One. *See North Carolina v. FERC*, 730 F.2d 790, 796 (D.C. Cir. 1984) (noting agency statement that it approved three agreements as "a comprehensive settlement which, as a package, appears reasonable").

The first-class mail adjustment, however, has no connection with the Order's other categories, which are concerned primarily with rate changes for marketing mail, periodicals, package services, overweight item charges, and special services. These rates are not interconnected by statute and the Commission analyzed them independently in separate ordering paragraphs. We see no reason why these other rates cannot "function sensibly" without the first-class mail category. *MD/DC/DE Broads. Ass'n*, 236 F.3d at 22. Because both requirements for severability are satisfied, we vacate the first-class rate adjustments and leave the remainder of Order 4875 in place.

26

IV.

Although the five-cent stamp price hike may have gone unnoticed by many, the American Revolution was fomented in part by ordinary people who objected to taxation through stamps.[8] Carlson's objections arise in less fraught times. We conclude that this stamp price hike violated the APA because the Commission failed to consider the relevant policies of the PAEA, particularly those raised in the public comments. We therefore grant Carlson's petition for review, vacating the part of Order 4875 that includes the stamp price hike and the rate adjustments to the category of first-class mail.

*So ordered.*

---

[8] *See, e.g.*, Justin DuRivage & Claire Priest, *The Stamp Act and the Political Origins of American Legal and Economic Institutions*, 88 S. Cal. L. Rev. 875, 875 (2015) ("The British Parliament's enactment of the Stamp Act of 1765 is widely acknowledged as a starting point for the acceleration of tensions that led to the Declaration of Independence in 1776.") (citing Edmund S. Morgan, *The Birth of the Republic, 1763-89*, at 18–28 (3d ed. 1992); Gordan S. Wood, *The American Revolution* 29–37 (2003)).

APPENDIX

Title 39 U.S.C. § 3622(b) provides:

"[The Commission's system for regulating rates and classes] shall be designed to achieve the following objectives, each of which shall be applied in conjunction with the others:

(1) To maximize incentives to reduce costs and increase efficiency.

(2) To create predictability and stability in rates.

(3) To maintain high quality service standards established under section 3691.

(4) To allow the Postal Service pricing flexibility.

(5) To assure adequate revenues, including retained earnings, to maintain financial stability.

(6) To reduce the administrative burden and increase the transparency of the ratemaking process.

(7) To enhance mail security and deter terrorism.

(8) To establish and maintain a just and reasonable schedule for rates and classifications, however the objective under this paragraph shall not be construed to prohibit the Postal Service from making changes of unequal magnitude within, between, or among classes of mail.

(9) To allocate the total institutional costs of the Postal Service appropriately between market-dominant and competitive products."

Title 39 U.S.C. § 3622(c) provides:

"In establishing or revising such system, the Postal Regulatory Commission shall take into account:

(1) the value of the mail service actually provided each class or type of mail service to both the sender and the recipient, including but not limited to the collection, mode of transportation, and priority of delivery;

(2) the requirement that each class of mail or type of mail service bear the direct and indirect postal costs attributable to each class or type of mail service through reliably identified causal relationships plus that portion of all other costs of the Postal Service reasonably assignable to such class or type;

(3) the effect of rate increases upon the general public, business mail users, and enterprises in the private sector of the economy engaged in the delivery of mail matter other than letters;

(4) the available alternative means of sending and receiving letters and other mail matter at reasonable costs;

(5) the degree of preparation of mail for delivery into the postal system performed by the mailer and its effect upon reducing costs to the Postal Service;

(6) simplicity of structure for the entire schedule and simple, identifiable relationships between the rates or fees charged the various classes of mail for postal services;

(7) the importance of pricing flexibility to encourage increased mail volume and operational efficiency;

(8) the relative value to the people of the kinds of mail matter entered into the postal system and the desirability and justification for special classifications and services of mail;

(9) the importance of providing classifications with extremely high degrees of reliability and speed of delivery and of providing those that do not require high degrees of reliability and speed of delivery;

(10) the desirability of special classifications for both postal users and the Postal Service in accordance with the policies of this title, including agreements between the Postal Service and postal users, when available on public and reasonable terms to similarly situated mailers, that—

    (A) either—

        (i) improve the net financial position of the Postal Service through reducing Postal Service costs or increasing the overall contribution to the institutional costs of the Postal Service; or

        (ii) enhance the performance of mail preparation, processing, transportation, or other functions; and

    (B) do not cause unreasonable harm to the marketplace.

(11) the educational, cultural, scientific, and informational value to the recipient of mail matter;

(12) the need for the Postal Service to increase its efficiency and reduce its costs, including infrastructure costs, to help maintain high quality, affordable postal services;

(13) the value to the Postal Service and postal users of promoting intelligent mail and of secure, sender-identified mail; and

(14) the policies of this title as well as such other factors as the Commission determines appropriate."