[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-13700

_____

DAVID F. HEWITT,
TAMMY K. HEWITT,

Petitioners-Appellants,

*versus*

COMMISSIONER OF IRS,

Respondent-Appellee.

_____

Petition for Review of a Decision of the
U.S. Tax Court
Agency No. 23809-17

_____

Before WILSON, LAGOA, Circuit Judges, and MARTINEZ, District Judge.

LAGOA, Circuit Judge:

David and Tammy Hewitt seek review of the Tax Court's order determining that they were not entitled to carryover a charitable contribution deduction for the donation of a conservation easement (the "Easement"). The Tax Court concluded that the Easement did not satisfy the "protected-in-perpetuity" requirement, *see* I.R.C. § 170(h)(5), because the Easement deed violated the judicial extinguishment proceeds formula set forth in Treas. Reg. § 1.170A-14(g)(6)(ii). Specifically, in the event of judicial extinguishment, the Easement deed subtracts the value of post-donation improvements to the property from the extinguishment proceeds before determining the donee's share of the proceeds, which the Commissioner asserts violated § 1.170A-14(g)(6)(ii) and, thus, § 170(h)(5)'s protected-in-perpetuity requirement.

On appeal, the Hewitts make several arguments as to why the Tax Court erred. They contend that the Commissioner's interpretation of § 1.170A-14(g)(6)(ii) is incorrect, as subtraction of the value of post-donation improvements from the proceeds allocated to the donee is the "better reading" of the regulation. As to this interpretation argument, we recently determined, in *TOT Property Holdings, LLC v. Commissioner*, that § 1.170A-14(g)(6)(ii) "does not indicate that any amount, including that attributable to improvements, may be subtracted out." 1 F.4th 1354, 1363 (11th

Cir. 2021) (quoting *PBBM-Rose Hill, Ltd. v. Comm'r*, 900 F.3d 193, 208 (5th Cir. 2018)).

But, based on the taxpayers' concession in *TOT*, *id.* at 1362 & n.13, we did not address whether § 1.170A-14(g)(6)(ii) was procedurally valid under the Administrative Procedures Act ("APA") or substantively valid under the framework in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Unlike the taxpayers in *TOT*, the Hewitts challenge the regulation's validity on appeal. Specifically, the Hewitts argue that the Commissioner's interpretation of § 1.170A-14(g)(6)(ii)—prohibiting the subtraction of the value of post-donation improvements to the property on which a conservation easement exists from the proceeds in the event of judicial extinguishment—is arbitrary and capricious for violating the procedural requirements of the APA, *see* 5 U.S.C. § 706, because the U.S. Treasury Department failed to respond to significant comments as to the improvements issue in promulgating the regulation. The Hewitts further argue that the regulation is substantively invalid under *Chevron* as an unreasonable interpretation of the statute.

After careful review, and for the reasons explained below, we conclude that the Commissioner's interpretation of § 1.170A-14(g)(6)(ii) is arbitrary and capricious and violates the APA's procedural requirements.[1] And because we find the Commissioner's

---

[1] Because we conclude that § 1.170A-14(g)(6)(ii) is procedurally invalid under the APA, we do not reach the Hewitts' *Chevron*-related arguments.

interpretation of § 1.170A-14(g)(6)(ii) to be invalid under the APA, the Easement deed's subtraction of the value of post-donation improvements from the extinguishment proceeds allocated to the donee does not violate § 170(h)(5)'s protected-in-perpetuity requirement. Accordingly, we reverse the Tax Court's order disallowing the Hewitts' carryover deduction for the conservation easement and remand for further proceedings.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

David and Tammy Hewitt[2] reside in Randolph County, Alabama, near Alabama's border with Georgia. David's father moved to Alabama in the early 1950s, acquiring land there to raise cattle, farm, and harvest timber. In the early 1990s, his father transferred a portion of this land to David's sister.

David subsequently acquired 257.2 acres of land in Randolph County (the "Property") in four transactions. His sister transferred approximately 232 acres to David through a series of three warranty deeds dated January 27, 1997, January 23, 1998, and July 1, 1998. In 2001, David purchased 25 more acres of adjected land and bought out the interest of two unrelated persons who co-owned a 400-acre parcel with his father. By 2012, David and his sister owned approximately 1,325 acres in Randolph and Cleburne Counties, Alabama. The cumulative property owned between the two siblings had no zoning ordinances at the time of the

---

[2] We refer to the Hewitts individually by their first names where relevant.

Easement's grant and consisted of pastureland along a county road and wooded areas with steep topography, rough terrain, and limited road access. David has used, and continues to use, portions of the Property as a cattle ranch.

On December 28, 2012, David donated the Easement on the Property to and for the benefit of Pelican Coast Conservancy, Inc., a wholly owned subsidiary of the Atlantic Coast Conservancy, Inc. (collectively, "the Conservancy"), through a document entitled Deed of Conservation Easement, which was recorded with the Probate Judge for Randolph County the same day. The Easement deed provides that the Easement's purpose is "to assure that the Property will be retained forever predominately in its natural condition and to prevent any use of the Property that will impair or interfere with the Conservation Values as set forth in this Easement." The Easement deed sets forth a list of "prohibited uses" and permits the Conservancy the right to enter upon the Property at reasonable times to preserve and protect the conservation features. The deed also contains a "permitted uses" section, which reserved to the Hewitts the right to build certain types of improvements on certain areas of the Property.

Additionally, section 15 of the deed governs judicial extinguishment of the Easement. Subsection 15.1 provides:

> *Extinguishment.* If circumstances arise in the future such as render the purpose of this Easement impossible to accomplish, this Easement can only be terminated or extinguished, whether in whole or in part,

by judicial proceedings in a court of competent juris-
diction, and the amount of the proceeds to which
Conservancy shall be entitled, after the satisfaction or
prior claims, from any sale, exchange, or involuntary
conversion of all or any portion of the Property sub-
sequent to such termination or extinguishment
(herein collectively "Extinguishment") shall be deter-
mined to be at least equal to the perpetual conserva-
tion restriction's proportionate value unless other-
wise provided by Alabama law at the time, in accord-
ance with Subsection 15.2 . . . .

In turn, subsection 15.2 provides:

*Proceeds*.  This Easement constitutes a real property
interest immediately vested in Conservancy.  For the
purposes of this Subsection, the parties stipulate that
this Easement shall have at the time of Extinguish-
ment a fair market value determined by multiplying
the then fair market value of the Property unencum-
bered by the Easement (*minus any increase in value
after the date of this grant attributable to improve-
ments*) by the ratio of the value of the Easement at
the time of this grant to the value of the Property,
without deduction for the value of the Easement, at
the time of this grant. . . . For the purposes of this par-
agraph, the ratio of the value of the Easement to the

value of the Property unencumbered by the Ease-
ment shall remain constant.

(emphasis added).

As stipulated by the parties, the Conservancy provided Da-
vid with a contemporaneous written acknowledgement within the
meaning of I.R.C. § 170(f)(8), and the Conservancy was a "qualified
organization" within the meaning of I.R.C. § 170(h)(3) at the time
of the Easement donation.  The Commissioner also does not con-
test that the Property complied with the requirements of I.R.C.
§ 170(h)(4)(A)(ii)–(iii).

While David is the sole owner of the Property, the Hewitts
jointly filed their tax returns for the relevant tax years at issue—
2012, 2013, and 2014.  For the 2012 tax year, the Hewitts reported
a noncash, charitable contribution for the donation of the Ease-
ment in the amount of $2,788,000.  An appraisal of the Easement
was attached to their 2012 return, which the Commissioner—only
for the purposes of this appeal—does not contest was a qualified
appraisal prepared by a qualified appraiser as required by I.R.C. §
170(f)(11)(E).  However, the Hewitts and the Commissioner do not
stipulate to the appraisal's contents.  Due to limitations on charita-
ble contribution deductions, the deduction for the Easement con-
tribution was $57,738.

The Hewitts timely filed their federal income tax returns for
the 2013 and 2014 tax years.  The 2013 return claimed a noncash,
charitable contribution carryforward deduction from the 2012

charitable contribution deduction for the Easement in the amount of $1,868,782, and the 2014 return carried the same deduction in the amount of $861,480.

On August 16, 2017, the Commissioner timely mailed a statutory notice of deficiency ("NOD") for the 2013 and 2014 taxable years to the Hewitts.  The NOD provided that the Hewitts owed: (1) a $336,894 tax deficiency and an I.R.C. § 6662 penalty of $134,757.60 for the 2013 year; and (2) a $347,878 tax deficiency and $136,458.40 penalty for the 2014 year.   The NOD disallowed $2,730,262 of the charitable contribution carryover deduction from 2012 for 2013 and 2014.

On November 14, 2017, the Hewitts timely filed  a petition for redetermination with the Tax Court, challenging the disallowances for the carryover deductions related to the Easement in the NOD.  In a pretrial memorandum, the Commissioner argued that the Easement deed failed to comply with Treas. Reg. § 1.170A-14(g)(6) due to an "improvements clause" included therein.  The case proceeded to trial.  In their post-trial brief, the Hewitts contended, among other things, that § 1.170A-14(g)(6)(ii), as interpreted by the Commissioner, was not a valid exercise of Treasury's rulemaking authority.

On June 17, 2020, the Tax Court issued a memorandum opinion determining that the Hewitts were not entitled to carryover the charitable contribution deduction for the donation of the

Easement.[3]  The Tax Court explained that section 15 of the deed "subtracts the value of posteasement improvements before determining the Conservancy's share of the extinguishment proceeds and fails to allocate the extinguishment proceeds in accordance with" § 1.170A-14(g)(6), as that regulation "does not permit the value of posteasement improvements to be subtracted from the proceeds before determining the donee's share." The Tax Court rejected the Hewitts' argument that an easement donee's right to any extinguishment proceeds is limited to those from the property as it existed at the time of the grant as contrary to the regulation's text. Therefore, the Tax Court explained that "[f]or purposes of the extinguishment provisions, the subject property may change, but the donee's property right to the extinguishment proceeds may not." The Tax Court also rejected the Hewitts' challenge to § 1.170A-14(g)(6)(ii)'s procedural and substantive validity based on its decision in *Oakbrook Land Holdings, LLC v. Comm'r*, 154 T.C. 180 (2020).

This appeal ensued.

## II.    STANDARD OF REVIEW

We review the Tax Court's legal conclusions *de novo* and its factual findings for clear error. *Kardash v. Comm'r*, 866 F.3d 1249, 1252 (11th Cir. 2017).

---

[3] The Tax Court found the Hewitts were not liable for the penalties assessed against them in the NOD, and the Commissioner does not challenge this ruling on appeal.

## III.    ANALYSIS

Under the APA, a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Our review standard is "narrow," and we "will not substitute [our] judgment for that of the agency." *Lloyd Noland Hosp. & Clinic v. Heckler*, 762 F.2d 1561, 1565 (11th Cir. 1985).  However, "[i]n employing this deferential standard of review," we do "not rubber stamp the action of the agency." *Port of Jacksonville Mar. Ad Hoc Comm., Inc. v. U.S. Coast Guard*, 788 F.2d 705, 708 (11th Cir. 1986).  Rather, "[w]e must determine whether the decision was based on a consideration of the relevant factors and whether there was a clear judgment error." *Lloyd Noland*, 762 F.2d at 1565 (citing *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  Furthermore, "[w]e may not supply a reasoned basis for the agency's action that the agency itself has not given," although we will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *State Farm*, 463 U.S. at 43 (first quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1974), then quoting *Bowman Transp. Inc. v. Ark.-Best Freight Sys.*, 419 U.S. 281, 286 (1974)); *accord Judulang v. Holder*, 565 U.S. 42, 52–55 (2011).  And "courts may not accept . . . counsel's *post hoc* rationalizations for agency actions," as "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *State Farm*, 565 U.S. at 50.

The APA "prescribes a three-step procedure for so-called 'notice-and-comment rulemaking.'" *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015); *accord* 5 U.S.C. § 553. First, an agency "must issue a '[g]eneral notice of proposed rulemaking,' ordinarily by publication in the Federal Register." *Perez*, 575 U.S. at 96 (alteration in original) (quoting § 553(b)). Second, "if 'notice [is] required,' the agency must 'give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments,'" and the agency "must consider and respond to significant comments received during the period for public comment." *Id.* (alteration in original) (quoting § 553(c)). Third, in promulgating the final rule, the agency "must include in the rule's text 'a concise general statement of [its] basis and purpose.'" *Id.* (alteration in original) (quoting § 553(c)). As the Supreme Court has explained, "Rules issued through the notice-and-comment process are often referred to as 'legislative rules' because they have the 'force and effect of law.'" *Id.* (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302–03 (1979)).

Thus, "[t]he APA requires the agency to incorporate into a new rule a concise general statement of its basis and purpose." *Lloyd Noland*, 762 F.2d at 1566. As we have explained, "statement[s] may vary, but should fully explain the factual and legal basis for the rule." *Id.* Indeed, "[b]asis and purpose statements must enable the reviewing court to see the objections and why the agency reacted to them as it did," *id.*, as "[o]ne of the basic procedural requirements of administrative rulemaking is that an agency

must give adequate reasons for its decisions," *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). And, in the statement, the agency must rebut "vital relevant" or significant comments. *See Lloyd Noland*, 762 F.2d at 1567; *Hussion v. Madigan*, 950 F.2d 1546, 1554 (11th Cir. 1992) ("Under the 'arbitrary and capricious' standard of review, an agency is . . . required to respond to significant comments that cast doubt on the reasonableness of the rule the agency adopts." (quoting *Balt. Gas & Elec. Co. v. United States*, 817 F.2d 108, 116 (D.C. Cir. 1987))). The purpose of notice-and-comment rulemaking is to "give[] affected parties fair warning of potential changes in the law and an opportunity to be heard on those changes" while "afford[ing] the agency a chance to avoid errors and make a more informed decision." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1816 (2019).

Turning to the statutory and regulatory tax provisions at hand, I.R.C. § 170(a) generally allows taxpayers to deduct certain charitable contributions. While a taxpayer normally is not entitled to deduct the donation of "an interest in property which consists of less than the taxpayer's entire interest in such property," *id.* § 170(f)(3)(A), an exception is made for a "qualified conservation contribution," *id.* § 170(f)(3)(B)(iii), (h); *accord TOT*, 1 F.4th at 1361. Congress created this exception, codified at I.R.C. § 170(f)(3)(B)(iii), (h), in 1980. Tax Treatment Extension Act of 1980, Pub. L. No. 96-541, § 6, 94 Stat. 3204, 3206; *Oakbrook*, 154 T.C. at 185. Under § 170(h), for a contribution to be a "qualified conservation contribution," the contribution must be "(A) of a

qualified real property interest, (B) to a qualified organization, (C) exclusively for conservation purposes." § 170(h)(1). A "qualified real property interest" includes "a restriction (granted in perpetuity) on the use which may be made of the real property." 170(h)(2)(C). Additionally, § 170(h)(5)(A) provides that, for purposes of subsection (h), "[a] contribution shall not be treated as exclusively for conservation purposes unless the conservation purpose is protected in perpetuity." The statute, however, does not define the "protected in perpetuity" requirement. *TOT*, 1 F.4th at 1362.

On May 23, 1983, Treasury issued a notice of proposed rulemaking with "proposed regulations relating to contributions of partial interests in property for conservation purposes." Qualified Conservation Contribution; Proposed Rulemaking, 48 Fed. Reg. 22,940, 22,940 (May 23, 1983). Then, on January 14, 1986, Treasury issued final regulations, including the regulation at issue in this case—Treas. Reg. § 1.170A-14(g)(6)—governing the allocation of proceeds between the donor and donee in the event of judicial extinguishment of a donated conservation easement. Income Taxes; Qualified Conservation Contributions, 51 Fed. Reg. 1496 (Jan. 14, 1986). Section 1.170A-14(g)(6), titled "Extinguishment," provides:

> **(i) In general.** If a subsequent unexpected change in the conditions surrounding the property that is the subject of a donation under this paragraph can make impossible or impractical the continued use of the property for conservation purposes, the conservation

purpose can nonetheless be treated as protected in perpetuity if the restrictions are extinguished by judicial proceeding and all of the donee's proceeds (determined under paragraph (g)(6)(ii) of this section) from a subsequent sale or exchange of the property are used by the donee organization in a manner consistent with the conservation purposes of the original contribution.

(ii) Proceeds. . . . [F]or a deduction to be allowed under this section, at the time of the gift the donor must agree that the donation of the perpetual conservation restriction gives rise to a property right, immediately vested in the donee organization, with a fair market value that is at least equal to the proportionate value that the perpetual conservation restriction at the time of the gift, bears to the value of the property as a whole at that time. . . . For purposes of this paragraph (g)(6)(ii), that proportionate value of the donee's property rights shall remain constant. Accordingly, when a change in conditions give rise to the extinguishment of a perpetual conservation restriction under paragraph (g)(6)(i) of this section, the donee organization, on a subsequent sale, exchange, or involuntary conversion of the subject property, must be entitled to a portion of the proceeds at least equal to that proportionate value of the perpetual

conservation restriction, unless state law provides
that the donor is entitled to the full proceeds from the
conversion without regard to the terms of the prior
perpetual conservation restriction.

To summarize, "the regulations require that the donee of an
easement be granted a vested right to the value of judicial sale pro-
ceeds (e.g. in condemnation) multiplied by 'a fraction equal to the
value of the conservation easement at the time of the gift, divided
by the value of the property as a whole at that time.'" *TOT*, 1 F.4th
at 1362 (quoting *PBBM-Rose Hill*, 900 F.3d at 207). And, in *TOT*,
we found that § 1.170A-14(g)(6)(ii)'s proceeds formula "does not al-
low for 'any increase in value after the date of th[e] grant attribut-
able to improvements' to be subtracted from the extinguish-
ment . . . proceeds before the fraction is applied to the proceeds."
*Id.* at 1363 (alteration in original). But while we agreed with the
Commissioner's interpretation of the proceeds regulation in *TOT*,
we expressly did not consider the validity of the regulation under
the APA, as the taxpayers there did not make such a challenge. *Id.*
at 1362 n.13; *see also PBBM-Rose Hill*, 900 F.3d at 209 n.8 (declining
to address a challenge to § 1.170A-14(g)(6)(ii)'s validity as the tax-
payer failed to make the argument below).

Unlike *TOT*, the Hewitts assert that Treasury failed to com-
ply with the procedural requirements of the APA in promulgating
Treas. Reg. § 1.170A-14(g)(6)(ii). Specifically, the Hewitts contend
that the administrative record demonstrates that comments raising
concerns   with   § 1.170A-14(g)(6)(ii)   were   filed   during   the

rulemaking process, that those comments were "significant" such that they required a response from Treasury, and that Treasury failed to adequately respond to those significant comments in the final regulation's "basis and purpose" statement, in violation of the APA's procedural requirements. As such, the Hewitts contend that § 1.170A-14(g)(6)(ii), as interpreted by the Commissioner to prohibit the subtraction of the value of post-donation improvements to the easement property in the proceeds allocated to the donee in the event of judicial extinguishment, is arbitrary and capricious under the APA.

As previously noted, Treasury issued a notice of proposed rulemaking following Congress's enaction of § 170(h) for "proposed regulations relating to contributions of partial interests in property for conservation purposes" and to clarify "the statutory rules in effect under [the Tax Treatment Extension Act of 1980]." 48 Fed. Reg. at 22,940. One of the subparagraphs in the proposed regulations ultimately became § 1.170A-14(g)(6). *Id.* at 22,946–47. Of relevance here, the preamble to the proposed rulemaking explained that section 6 of that act "made extensive changes in the existing statute, eliminated the expiration date, and incorporated the relevant language into a new section 170(h)." *Id.* at 22,940. It further provided that "[t]he regulations reflect[ed] the major policy decisions made by the Congress and expressed in . . . committee reports." *Id.* And Treasury stated that it would consider any written comments submitted before adopting the proposed regulations. *Id.* at 22,941.

Following Treasury's request for public comments, it received more than 700 pages of commentary from ninety organizations and individuals. Of the ninety commenters, thirteen offered comments as to the proposed extinguishment proceeds regulation. *Oakbrook*, 154 T.C. at 186. The Hewitts contend that seven of those thirteen commenters "expressed concern that allocation of post-extinguishment proceeds under the proposed Proceeds Regulation was unworkable, did not reflect the reality of the donee's interest, or could result in an unfair loss to the property owner and a corresponding windfall for the donee."

Turning to the most detailed comment, the New York Landmarks Conservancy ("NYLC") urged Treasury to delete the proposed proceeds regulation because it contained pervasive "problems of policy and practical application." NYLC stated that while Congress enacted the statute "to encourage the protection of [the] . . . environment through the donation of conservation restrictions," the proposed regulation "would thwart the purpose of the statute by deterring prospective donors," as those donors would "likely . . . be discouraged from making a donation which may tie themselves or future owners to share proceeds of a sale or exchange with the charitable organization [donee] under circumstances which cannot possibly be foreseen." NYLC explained that prospective donors frequently were concerned about "perpetuity" issues, which were "mollified upon the donor's recognition that common law permits the extinguishment of restrictions when they no longer serve the original intended purposes." But NYLC

18                    Opinion of the Court                    20-13700

believed "[t]he prospect of extinguishment would no longer mollify these fears if a split of proceeds under unknown circumstances would be required." As such, and because "the possibility of extinguishment is relatively remote," NYLC stated it was "unnecessary" for Treasury "to provide for allocation of proceeds after extinguishment."

NYLC also specifically commented on the issue of whether the value of post-donation improvements to the easement property should be included or excluded from the extinguishment proceeds formula contained in the regulation. NYLC stated that the regulation's structure "contemplates that a ratio of value of the conservation restriction to value of the fee will be fixed at the time of the donation and will remain in effect forever thereafter." But NYLC asserted that the formula "fail[ed] to take into account that improvements may be made thereafter by the owner which should properly alter the ratio." In support of its concern, NYLC presented a mathematical example, which was based on a fact pattern in the proposed regulations, see 48 Fed. Reg. at 22,945, to show that requiring the prospective donor to turn over extinguishment proceeds attributable to post-donation improvements to the donee "would obviously be undesirable to the prospective donor and would constitute a windfall to the donee organization." See Oakbrook, 154 T.C. at 224 (Toro, J., concurring in result). Thus, "in light of the potential inequities," NYLC recommended "that the proposed proceeds formula be revised to prevent such inequities should the . . . Treasury decide to retain the provision" but

"*strongly* recommend[ed] deletion of the entire extinguishment provision." (emphasis added).

While NYLC offered the most extensive comments on the proposed proceeds regulation—including being the only commenter that addressed the allocation of the value of proceeds attributable to future improvements by the donor—other commenters expressed criticism or urged caution as to the proposed extinguishment regulations. The Landmarks Preservation Council of Illinois, for example, "urge[d] caution in the treatment of the concept of 'extinguishment' in the regulations," as "[t]he discussion in the regulations of the conditions under which that binding agreement may be abrogated lends an undesirable air of legitimacy to the concept of 'extinguishment.'" It also warned that the regulations could "create a potential disincentive to the donation of easements," noting that "[t]he obligation imposed on the donor or subsequent owner to pay to the donee organization an amount at least equal to the original proportionate value of the easement" could place "the donor at risk for an amount of money"—e.g., payments to a third party lender—"for which he may not be compensated by the disposition of the proceeds of sale." The Land Trust Exchange stated that the proposed proceeds regulation "may result in donors or donees having to pay real estate transfer taxes" and that it was "unnecessary." The Trust for Public Land stated that it had "serious doubts whether the provision . . . could be enforced against anyone other than the original donor of the easement" and that "the tax benefit rule is a satisfactory means of meeting any concern

20                    Opinion of the Court                    20-13700

the IRS may have that a donor might receive the double benefit of
an easement deduction followed by later recovery of the value do-
nated." The Brandywine Conservancy cautioned that the regula-
tion "may unnecessarily restrict the amount, payable to the holder
of an easement, if changes in surrounding territory have made the
easement proportionately more valuable than the retained inter-
est" and that "[t]he donee should be entitled to proceeds equal to
the greater of its original proportionate value or its proportionate
value at the time of the extinguishment." And the Nature Conserv-
ancy and the Maine Coast Heritage Trust both mentioned that the
regulation should be "clear" that the original proportionate value
is the minimum that a donee will receive in extinguishment pro-
ceeds.[4]

After a public hearing, Treasury adopted the proposed reg-
ulations with revisions. 51 Fed. Reg. at 1496. In the preamble to
the final rulemaking, Treasury stated that "[t]hese regulations

---

[4] As to the comments from the Brandywine Conservancy, the Nature Con-
servancy, and the Maine Coast Heritage Trust, the Tax Court in *Oakbrook*
presumed that Treasury responded to those organizations' comments by
changing the language of the regulation from the donee of the easement being
vested with a property right having a fair market value "that is a minimum
ascertainable proportion of the fair market value to the entire property" to a
fair market value "that is at least equal to the proportionate value that the
perpetual conservation restriction at the time of the gift, bears to the value of
the property as a whole at that time." 154 T.C. at 188 (first quoting 48 Fed.
Reg. at 22,946, then quoting § 1.170A-14(g)(6)(ii)). But Treasury did not spe-
cifically explain in the final regulation that its change in the language was in
response to those organizations' comments.

provide necessary guidance to the public for compliance with the law and affect donors and donees of qualified conservation contributions" and that it had "consider[ed] . . . all comments regarding the proposed amendments." *Id.* In the subsequent "Summary of Comments" section, however, Treasury did not discuss or respond to the comments made by NYLC or the other six commenters concerning the extinguishment proceeds regulation. *See id.* at 1497–98; *Oakbrook*, 154 T.C. at 188 ("The 'judicial extinguishment' provision is not among the amendments specifically addressed in the 'Summary of Comments.'"). And Treasury stated that "[a]lthough a notice of proposed rulemaking which solicited public comments was issued, the Internal Revenue Service concluded when the notice was issued that the regulations are interpretative and that the notice and public comment procedure requirement of 5 U.S.C. [§] 553 [of the APA] did not apply." 51 Fed. Reg. at 1498.

The Hewitts assert that these seven comments—in particular, NYLC's comment—were significant such that they warranted a response from Treasury in promulgating the final extinguishment proceeds regulation. In response, the Commissioner asserts that none of the thirteen comments were significant to require a response from Treasury because they did not raise any point casting doubt on the regulation's reasonableness.

Thus, the issue before us is whether Treasury's failure to respond to NYLC's and the other commenters' concerns about the extinguishment proceeds regulation was in violation of the procedural requirements of the APA. Phrased differently, we must

determine whether § 1.170A-14(g)(6)(ii), as interpreted by the Commissioner to prohibit the subtraction of any amount of proceeds attributable to post-donation improvements to the easement property in the event of judicial extinguishment, is procedurally valid under the APA where: (1) one commenter—NYLC—made specific comments raising the improvements issue as it relates to extinguishment proceeds and recommended deletion of the provision; (2) six other organizations submitted comments criticizing or urging caution as to the regulation; and (3) Treasury failed to specifically respond to any of those comments, instead simply stating that it had considered "all comments."

Below, the Tax Court found that the regulation was procedurally valid under the APA, relying on its decision in *Oakbrook*. In *Oakbrook*, the Tax Court considered the comments Treasury received as to "the fact that the 'proportionate share' formula [in § 1.170A-14(g)(6)(ii)] does not account for the possibility of donor improvements." 154 T.C. at 192. The Tax Court concluded that the proceeds regulation as to the post-donation improvements was procedurally valid under the APA. *Id.* at 195. The court first noted that it had found the statement "[a]fter consideration of all comments," coupled with an administrative record, to be "sufficient to find that Treasury had considered the relevant matter presented to it." *Id.* at 191–92 (alteration in original) (citing *Wing v. Comm'r*, 81 T.C. 17, 31–32 (1983)). The Tax Court stated that "[t]he APA 'has never been interpreted to require the agency to respond to every comment, or to analy[z]e every issue or alternative raised by

the comments, no matter how insubstantial.'" *Id.* at 192 (quoting *Thompson v. Clark*, 741 F.2d 401, 408 (D.C. Cir. 1984)). The Tax Court further noted that "[o]nly one of the 90 commenters"—NYLC—"mentioned donor improvements, and it devoted exactly one paragraph to this subject." *Id.* The Tax Court stated that NYLC's point that donors "are likely to be discouraged from making a donation" was "a supposition that Treasury may reasonably have discounted." *Id.* And it stated that, as to the improvements issue, "[t]he administrative record reflects that no substantive alternatives to the final rules were presented for Treasury's consideration." *Id.* at 193 (alteration in original) (quoting *SIH Partners LLLP v. Comm'r*, 150 T.C. 28, 44 (2018)). The Tax Court found that "NYLC offered no suggestion about how the subject of donor improvements might be handled; it simply recommended 'deletion of the entire extinguishment provision.'" *Id.*

As to the final regulations' preamble, the Tax Court rejected the argument that Treasury did not comply with the APA because the preamble "did not discuss the 'basis and purpose' of the judicial extinguishment provision specifically." *Id.* at 193–94. The court explained that "[e]ven where a regulation contains no statement of basis and purpose whatsoever, it may be upheld 'where the basis and purpose . . . [are] considered obvious.'" *Id.* at 194 (quoting *Cal-Almond, Inc. v. U.S. Dep't of Agric.*, 14 F.3d 429, 443 (9th Cir. 1993)). The court noted the final regulations' preamble "explains that they were being promulgated to 'provide necessary guidance to the public for compliance with the law,' as recently amended by

Congress, 'relating to contributions . . . of partial interests in property for conservation purposes,'" with the proposed regulations' preamble stating, "the requirement that conservation easements 'be perpetual in order to qualify for a deduction.'" *Id.* (first quoting 51 Fed. Reg. at 1496, then quoting 48 Fed. Reg. at 22,940). And it found that "[t]he purpose of the 'judicial extinguishment' rule is plain on its face—to provide a mechanism to ensure that the conservation purpose can be deemed 'protected in perpetuity' notwithstanding the possibility that the easement might later be extinguished." *Id.* (quoting § 1.170A-14(g)(6)(i)). Finally, the Tax Court minimized the importance of the extinguishment proceeds provision in the context of the final regulations—"one subparagraph of a regulation project consisting of 10 paragraphs, 23 subparagraphs, 30 subdivisions, and 21 examples"—as the APA did not "mandate that an agency explain the basis and purpose of each individual component of a regulation separately." *Id.* Thus, the court concluded that "[t]he broad statements of purpose contained in the preambles to the final and proposed regulations, coupled with obvious inferences drawn from the regulations themselves, [were] more than adequate." *Id.*

The *Oakbrook* decision was not unanimous. Judge Toro, in a concurring in result opinion, found that, if the proceeds regulation was read in the way proposed by the Commissioner, i.e., to bar subtraction of the value of post-donation improvements from the extinguishment proceeds, it failed to comply with the APA's procedural requirements. *See id.* at 216 (Toro, J., concurring).

Judge Toro explained that the "Treasury received more than 700 pages of comments" during the comment period and that, in the final regulations, Treasury responded to those comments and other administrative matters in just two of the twelve pages—"six columns in the Federal Register"—consisting of the final regulations. *Id.* at 221. In his view, it was likely that Treasury "was simply following its historical position that the APA's procedural requirements did not apply to these types of regulations," noting that the final regulations referenced Treasury's belief that they did not require notice and comment and that this belief was mistaken. *Id.* at 222.

Judge Toro then found that the "Treasury failed to 'respond to "significant points" and consider "all relevant factors" raised by the public comments.'" *Id.* at 223 (quoting *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 334 (D.C. Cir. 2019)). Pointing specifically to NYLC's comment, Judge Toro explained that NYLC "made clear that, in its view, it would be inappropriate to condition the availability of the deduction for a conservation easement on the donor's agreement to turn over to the donee proceeds attributable to improvements on the real property interest that the Code permitted the donor to retain." *Id.* at 224. He further noted that NYLC: (1) "expressly tied its comments" to a specific rule and a specific fact pattern in the proposed regulations; (2) explained that the proposed proceeds regulation would "thwart the purpose of the statute," which NYLC stated was to "encourage the protection of our significant natural and built environment through the

donation of conservation restrictions"; and (3) recommended the deletion of the provision "or, at the very least, 'be revised to prevent . . . [the] inequities' it had identified." *Id.* (alterations in original). As such, Judge Toro explained that the administrative record left "no doubt" that NYLC's comment "'can be thought to challenge a fundamental premise' underlying the proposed agency decision." *Id.* (quoting *Carlson*, 938 F.3d at 344). The proposed regulations' preamble explained that they reflected Congress's "major policy decisions," and NYLC "in effect countered that the proposed rule on future donor improvements was contrary to those policy decisions, would lead to inequitable results that were inconsistent with the statute, and would deter future contributions." *Id.* at 225 (quoting 48 Fed. Reg. at 22,940). In other words, Judge Toro found that NYLC "offered comments that, 'if adopted, would require a change in an agency's proposed rule,'" and that "were both 'relevant and significant,' [as to] require[e] a response." *Id.* (first quoting *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 n.58 (D.C. Cir. 1977), then quoting *Grand Canyon Air Tour Coal. v. FAA*, 154 F.3d 455, 468 (D.C. Cir. 1998)).

Because Treasury did not provide a response to NYLC's comments, Judge Toro concluded that its actions failed to provide "an explanation [that] is clear enough that its 'path may reasonably be discerned'" or "provide any insight on 'what major issues of policy were ventilated . . . and why the agency reacted to them as it did' on this point." *Id.* at 225–26 (alterations in original) (first quoting *Encino Motorcars*, 579 U.S. at 221, then quoting *Carlson*, 938

F.3d at 344).  And it was "not the role of the courts to speculate on reasons that might have supported" Treasury's decision.  *Id.* at 226 (quoting *Encino Motorcars*, 579 U.S. at 224).  Judge Toro also explained that the *Oakbrook* majority's reasoning as to the issue was flawed for several reasons.  He explained that courts were "not required to 'take the agency's word that it considered all relevant matters,'" as the majority asserted.  *Id.* at 226–27 (quoting *PPG Indus., Inc. v. Costle*, 630 F.2d 462, 466 (6th Cir. 1980)).  He further noted that "[a] 'relevant and significant comment' requires a response, regardless of whether the point is made by many, a few, or even a single commenter," and "a comment does not lose its significance because it is presented succinctly."  *Id.* at 227 (quoting *Carlson*, 938 F.3d at 347).  And, if the scope of the project "was too large to permit an appropriate response to all 'relevant and significant comments,' then Treasury could have broken the project down into smaller parts."  *Id.*

In his dissenting opinion, Judge Holmes reached a similar conclusion to Judge Toro on the regulation's procedural invalidity under the APA.  He concluded that comments from NYLC and other organizations "were significant and [were] entitled to an agency response."  *See id.* at 245 (Holmes, J., dissenting).  Judge Holmes explained that Treasury's statement that it considered "all comments" was not sufficient under the APA, noting that the Federal Circuit, in *Dominion Resources, Inc. v. United States*, 681 F.3d 1313, 1319 (Fed. Cir. 2012), found a Treasury regulation procedurally invalid even though Treasury explicitly stated that "it rejected

the commentators' recommendation and brief explanation in general terms of how one of the provisions worked."[5]  *Oakbrook*, 154 T.C. at 245–46 (Holmes, J., dissenting).  He further explained that the final regulations at issue provided even less explanation than those in *Dominion Resources*, as Treasury failed to "even acknowledge the relevant comments or expressly state its disagreement with them" such that there was not even "a minimal level of analysis."  *Id.* at 248 (quoting *Encino Motorcars*, 579 U.S. at 2120).

After careful consideration of the agency record before us, the several opinions in *Oakbrook* and precedent from the Supreme Court, and this Court's interpretation of procedural validity under the APA, we conclude that § 1.170A-14(g)(6)(ii)—as read by the Commissioner to prohibit subtracting the value of post-donation improvements to the easement property from the proceeds allocated to the donor and donee in the event of judicial extinguishment—is arbitrary and capricious under the APA for failing to comply with the APA's procedural requirements and is thus invalid.  *See* §§ 553(c), 706(2)(A).

---

[5] Specifically, the preamble to the regulation at issue in *Dominion Resources* provided that "[c]ommentators suggested that the regulations provide that property is taken out of service only if the property is taken out of service for depreciation purposes" and that "[t]he final regulations do not adopt the suggestion concerning when property should be considered taken out of service." *See Dominion Res., Inc. v. United States*, 97 Fed. Cl. 239, 256 (2011) (quoting 59 Fed. Reg. 67,187, 67,192–93 (Dec. 29, 1994)), *rev'd*, 681 F.3d 1313 (Fed. Cir. 2012).

Our decision in *Lloyd Noland* is instructive. In that case, the plaintiffs challenged a malpractice insurance rule related to Medicare reimbursements that was promulgated by the Secretary of Health and Human Services. 762 F.2d at 1563. In addressing the plaintiffs' challenge, we concluded that the malpractice insurance rule was procedurally inadequate under the APA; specifically, it violated § 553(c), which we explained requires an agency "to incorporate into a new rule a concise general statement of its basis and purpose." *Id.* at 1566. The Secretary had failed to respond to comments that a study the agency relied on, which contained limited data that the authors cautioned against generalizing, was unreliable. *Id.* While the Secretary asserted that the objections were irrelevant, we concluded otherwise, such that those comments formed the basis of our holding that the malpractice insurance rule was arbitrary. *Id.* at 1566, 1568. We also rejected the Secretary's argument that she addressed certain hospitals' comments based on the rule's preamble, stating that "[w]e are aware that insurance companies generally do not determine insurance rates for malpractice insurance based upon the financial status of the patients," and that "premiums are 'incurred primarily for the benefit of the total overall patient population and for the protection of facility assets.'" *Id.* at 1566. While the Secretary suggested "that drawing a conclusion contrary to the comments does not mean they were not considered," we explained that "[b]asis and purpose statements must enable the reviewing court to see the objections and why the agency reacted to them as it did" and that agencies should rebut relevant comments. *Id.* at 1566–67. Because the Secretary's

response to the rule's comments were inadequate, we affirmed the district courts' invalidation of the rule. *Id.* at 1567, 1569; *cf. Encino Motorcars*, 579 U.S. at 2126–27 ("The [agency] said that, in reaching its decision, it had 'carefully considered all of the comments, analyses, and arguments made for and against the proposed changes.' . . . But when it came to explaining the 'good reasons for the new policy,' the [agency] said almost nothing. . . . [T]he [agency's] conclusory statements do not suffice to explain its decision." (first quoting 76 Fed. Reg. 18,832, 18,832 (Apr. 5, 2011), then quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009))).

The Commissioner argues that *Lloyd Noland* should be distinguished because, in that case, we reviewed "a factual, evidence-based rule," while the extinguishment proceeds regulation is based on Treasury's interpretation of § 170(h)(5)'s statutory protected-in-perpetuity requirement. But, in *Lloyd Noland*, we did not hold that the requirement that "[b]asis and purpose statements must enable the reviewing court to see the objections and why the agency reacted to them as it did"—including responding to significant comments—only applies when there is "erroneous data or fact finding" underlying the proposed regulation, as the Commissioner suggests, and we decline to do so here.

As in *Lloyd Noland*, in promulgating the final extinguishment proceeds regulation, Treasury failed to respond to the relevant and significant comment from NYLC as to the post-donation improvements issue. In the proposed regulations' preamble,

Treasury stated that the "regulations reflect the major policy decisions made by the Congress and expressed in the[] committee reports" to the Tax Treatment Extension Act of 1980. 48 Fed. Reg. at 22,940. One of the policy decisions reflected in those "committee reports," expressly referenced by Treasury, provided that "the preservation of our country's natural resources and cultural heritage is important," that "conservation easements now play an important role in preservation efforts," and that "provisions allowing deductions for conservation easements should be directed at the preservation of unique or otherwise significant land areas or structures." S. Rep. No. 96-1007, at 9 (1980). NYLC's comment recognized as much, stating that "[t]he statute was enacted by Congress to encourage the protection of our significant natural and built environment through the donation of conservation restrictions."

As to the proposed regulation overall, NYLC stated that the proposed regulation "would thwart the purpose of the statute by deterring prospective donors" concerned about tying themselves to share proceeds of a sale with the donee "under circumstances which cannot possibly be foreseen." Additionally, NYLC specifically commented that the regulation's proceeds formula: (1) "contemplates that a ratio of value of the conservation restriction to value of the fee will be fixed at the time of the donation and will remain in effect forever thereafter"; and (2) "fail[ed] to take into account that improvements may be made thereafter by the owner which should properly alter the ratio." And NYLC warned that this outcome "would obviously be undesirable to the prospective

donor and would constitute a windfall to the donee organization"
and "*strongly* recommend[ed] deletion of the entire extinguish-
ment provision," or at least revised "to prevent such inequities." In
other words, NYLC challenged a fundamental premise underlying
Treasury's proposed regulations by "in effect counter[ing] that the
proposed rule on future donor improvements was contrary to
those policy decisions [mentioned in the proposed regulations],
would lead to inequitable results that were inconsistent with the
statute, and would deter future contributions." *See Oakbrook*, 154
T.C. at 225 (Toro, J., concurring).

Simply put, NYLC's comment was significant and required
a response by Treasury to satisfy the APA's procedural require-
ments. And the fact that Treasury stated that it had considered "all
comments," without more discussion, does not change our analy-
sis, as it does not "enable [us] to see [NYLC's] objections and why
[Treasury] reacted to them as it did." *Lloyd Noland*, 762 F.2d at
1566.

But the Commissioner contends that the APA only required
Treasury "to respond to significant comments that cast doubt on
the reasonableness of the rule" it adopted. *See Hussion*, 950 F.2d
at 1554 (quoting *Balt. Gas*, 817 F.2d at 116); *see also Vt. Yankee
Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519,
553 (1978) ("[C]omments must be significant enough to step over
a threshold requirement of materiality before any lack of agency
response or consideration becomes of concern. The comment can-
not merely state that a particular mistake was made . . . ; it must

show why the mistake was of possible significance." (alteration in original) (quoting *Portland Cement Ass'n v. Ruckelhaus*, 486 F.2d 375, 394 (D.C. Cir. 1973))). And the Commissioner claims that Treasury's "primary (if not exclusive) consideration in crafting the proceeds regulation was the meaning of the statutory perpetuity requirement" and that, as such, NYLC was required "to explain why the rule would not further the goal of ensuring that the conservation purpose embodied in the perpetual use restriction would be protected in perpetuity as required by the statute." The Commissioner argues that NYLC's comment as to post-donation improvements did not address this consideration, and therefore was not a significant comment, because the comment was limited to (1) the "observation that the regulation would require the donee to receive a proportionate amount of the full proceeds," including any proceeds attributable to the donor's improvements, and (2) NYLC's belief that this situation would be "'undesirable' to the donor" and would result in a "windfall" for the donee.

While we agree with the Commissioner that Treasury was only required to respond to *significant* comments to comply with the APA's procedural requirements, we disagree with the Commissioner's argument that NYLC's comment was not significant. The Commissioner's claim that the "primary (if not exclusive)" purpose in crafting the proceeds regulation was *only* to interpret § 170(h)(5)'s "protected-in-perpetuity" requirement is inconsistent with the committee reports Treasury purportedly relied on. As identified by NYLC, one of the purported purposes set forth in the

committee reports, was to allow deductions for the donation of conservation easements to encourage donation for such easements. *See* S. Rep. No. 96-1007, at 9. And NYLC raised the post-donation improvements issue, as to extinguishment proceeds, and warned that its exclusion in the regulatory scheme would discourage prospective donors from donating conservation easements. In other words, NYLC's comment was specific to, and casted doubt on, the reasonableness of the proceeds regulation in light of one of Congress's committee reports which, according to Treasury, was "reflected" in the final regulations. 48 Fed. Reg. at 22,940 ("The regulations reflect the major policy decisions made by the Congress and expressed in the[] committee reports."). Furthermore, the final regulations did not limit the purpose of the proceeds regulation in the way the Commissioner suggests. We thus decline to classify NYLC's comment as insignificant based on the Commissioner's interpretation of Treasury's primary purpose in crafting the proceeds regulation.[6] *See State Farm*, 463 U.S. at 43, 50 ("'[W]e

---

[6] The Commissioner also points to Treasury's statements, in discussing donations of mortgaged property in the final regulations, that § 170(h)(5) "provides that the conservation purposes of the donation must be protected in perpetuity" and that "[i]n response to comments received, . . . the mortgagee must subordinate its rights under the mortgage to the right of the qualified organization to enforce the conservation purposes of the gift in perpetuity." 51 Fed. Reg. at 1498. The Commissioner argues that these statements show that Treasury viewed "the protected-in-perpetuity requirement as requiring express protection of the full value of the donee's interest in order to adequately protect the easement's conservation purposes," which is "the approach taken

may not supply a reasoned basis for the agency's action that the agency itself has not given.' . . . [C]ourts may not accept appellate counsel's post hoc rationalizations for agency action." (quoting *Chenery*, 332 U.S. at 196)).

The Commissioner additionally asserts that Treasury's revisions to the proposed proceeds regulation in the final regulation support Treasury's representation that it considered "all comments" in the final regulations' preamble. But, as the Commissioner concedes, the revisions were simply "clarifications" in response to other comments "expressing uncertainty" about the regulation's meaning "rather than substantive changes." Indeed, the proceeds regulation was revised from vesting the donee with a property right having a fair market value "that is a minimum ascertainable proportion of the fair market value to the entire property" to a fair market value "that is at least equal to the proportionate value that the perpetual conservation restriction at the time of the gift, bears to the value of the property as a whole at that time." *See Oakbrook*, 154 T.C. at 188 (comparing the proposed and final proceeds regulations). But this revision does not provide any indication that Treasury was responding to NYLC's significant comment

---

in the proceeds regulation." But Treasury's discussion of donations of mortgaged property in the final regulations does not reference the proceeds regulation nor give any indication that Treasury considered the post-donation improvements issue raised by NYLC. We thus find this argument, which speculates as to the reason of Treasury's actions, without merit. *See State Farm*, 463 U.S. at 43.

about the post-donation improvements issue. *See Lloyd Noland*, 762 F.2d at 1567; *Hussion*, 950 F.2d at 1554. We therefore reject this argument.

## IV.    CONCLUSION

Because Treasury, in promulgating the extinguishment proceeds regulation, failed to respond to NYLC's significant comment concerning the post-donation improvements issue as to proceeds, it violated the APA's procedural requirements. *See Lloyd Noland*, 762 F.2d at 1566; *see also Oakbrook*, 154 T.C. at 225–27 (Toro, J., concurring). We thus conclude that the Commissioner's interpretation of § 1.170A-14(g)(6)(ii), to disallow the subtraction of the value of post-donation improvements to the easement property in the extinguishment proceeds allocated to the done, is arbitrary and capricious and therefore invalid under the APA's procedural requirements. Accordingly, we reverse the Tax Court's order disallowing the Hewitts' carryover charitable deductions as to the donation of the conservation easement and remand for further proceedings.

**REVERSED AND REMANDED.**